# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs at Knoxville August 24, 2010

## STATE OF TENNESSEE v. JAMES RAY BULLARD

**Appeal from the Criminal Court for Davidson County**
**No. 2009-C-2242      Steve R. Dozier, Judge**

**No. M2009-02134-CCA-R3-CD - Filed March 4, 2011**

The Defendant, James Ray Bullard, pled guilty to evading arrest, a Class E felony, and four counts of theft of $500 or less, a Class A misdemeanor. See T.C.A. §§ 39-16-603, 39-14-103, 39-14-105(1) (2010). He was sentenced as a Range II, multiple offender to three years, six months' incarceration for the evading arrest conviction and to eleven months, twenty-nine days' incarceration for each of the theft convictions, with all sentences to be served consecutively. On appeal, the Defendant contends that the trial court erred by imposing a sentence of confinement. We affirm the judgments of the trial court.

**Tenn. R. App. 3 as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Jeffrey A. DeVasher, Nashville, Tennessee (on appeal), and Chase T. Smith, Nashville, Tennessee (at trial), for the appellant, James Ray Bullard.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; and Jennifer McMillen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant's guilty pleas and sentences were pursuant to a plea agreement with the manner of service of the sentences to be decided by the trial court. The State's recitation of facts at the guilty plea hearing reflected that the victim, Ronald Hollingsworth, experienced a rash of thefts from his Mr. Air tire inflation machines beginning in late October of 2008. The Defendant had broken into the machines in 2006, and the police immediately suspected him of the 2008 offenses.

The victim contacted a private investigator, Major George Currey, who installed video cameras in eight air machines owned by the victim. Six of the cameras caught the Defendant breaking into the air machines. The victim had stopped filing police reports because so many of the machines had been vandalized and ruined. Over $50,000 of damage was done to the machines. The victim lost his largest account with Daily Shell Service Stations because many of his machines were out of order. After the Defendant's arrest, only one theft of an air machine occurred in Clarksville.

The Defendant incurred the evading arrest charge when Officer Joshua C. Baker was fueling his police cruiser at a gas station on February 19, 2009, and he noticed that the Defendant was tampering with one of the air machines. The officer asked the Defendant what he was doing, and the Defendant sped off in his vehicle. The officer tried to chase him, but the Defendant was too far ahead for the officer to catch him. The Defendant agreed that it was satisfactory for the State to give the factual bases for his guilty pleas.

At the sentencing hearing, Major George H. Currey testified that he owned a private investigation and security company and that he had been a private investigator for about twenty-five years. He said the victim contacted him in late 2008 to investigate a series of thefts from the victim's coin-operated air machines. He said that he investigated similar thefts for David Smith in 2004 and that the Defendant was found guilty of those thefts. He said that the Defendant was caught on tape breaking into one of Mr. Smith's air machines and that one of Mr. Smith's employees caught the Defendant breaking into another machine. He said the Defendant threatened Mr. Smith's employee with a tire tool.

Major Currey testified that when the victim contacted him in 2008, the victim had filed numerous police reports and believed the Defendant was responsible for the thefts. He said the victim's company experienced about thirty-five break-ins to machines in the Middle Tennessee area within six weeks. He said that in each case, the thief either pried open the machine's door with a tire tool or knocked a hole in the front door and unlocked the machine with pliers or a vice grip. He agreed the lower right fronts of many of the machines were "ripped back or torn back."

Major Currey testified that he conducted limited surveillance of the Defendant but that surveillance was difficult due to the Defendant's erratic movements. He identified a photograph of the Defendant's house and a white Ford truck with a camper parked in the driveway. He said that the police took the photograph before he began working on the case and that by the time he conducted surveillance, the truck had been wrecked. He said that he never saw the Defendant drive the Ford truck but that he saw the Defendant drive a blue Jeep wagon and later a Plymouth van.

On cross-examination, Major Currey testified that the victim hired him in December of 2008. He said he researched the victim's work reports on the damaged machines and the Defendant's Tennessee Bureau of Investigation (TBI) report dating back to 1985. He identified a photograph taken of an air machine on Robertson Road and agreed that the machine did not have a hole cut in the bottom of the door. He said that he looked at a machine on Robertson Road that was broken into but that he did not know if the photograph showed the same one. He identified a photograph of an air machine at Elm Hill Pike and agreed that it had not been cut open. He said he did not know if it was the same machine as the one in which he placed a camera at that location. He said that the photograph showed one of the victim's newer machines and that he could tell that the machine had not been broken into previously.

Major Currey testified that he set up cameras on eight air machines and that the cameras showed only the Defendant breaking into the machines. He said that the cameras showed what was happening from the inside and that they showed the Defendant working on the machines "rather feverishly." He agreed that the cameras did not show the Defendant prying open the bottom of the machines and acknowledged that it was possible someone else had done that. He said he concluded his investigation when the police arrested the Defendant on February 20, 2009. He said he knew of no additional break-ins to the air machines since the Defendant's arrest.

Major Currey testified that he reviewed work orders by Bill Williams on the air machines. He said that whenever a break-in occurred during the investigation, Mr. Williams contacted him and filed a police report. He said Mr. Williams guided him regarding camera placement based on the amount of theft in particular areas. He said the Defendant broke into a machine located at Rivergate Parkway twice. He identified a work order report about a machine at Rivergate and read a note saying, "Large hole in bottom of the door, rod exposed." He agreed that the date on the report was April 4, 2009, and that the report said the door was fixed. He agreed it was possible that the door was compromised on the machine listed in the report.

Major Currey testified that the Defendant had been charged in Williamson and Rutherford Counties in addition to Davidson County. He said he defined the Middle Tennessee area as including Williamson, Wilson, and Rutherford Counties. He said that he did not have police reports on break-ins in Montgomery County but that the victim told him break-ins occurred there as well.

The victim testified that he was the owner of Hollingsworth Collections and of the air machines that were the subject of the Defendant's charges. He said that the thefts occurred sporadically for six to seven years and that this was the third time the Defendant broke into

-3-

the machines. He said that his total financial loss, including money stolen, repair costs, time invested, and investigative costs equaled $35,000 to $50,000. He denied knowing of machines that were broken into by someone other than the Defendant. He agreed that his employees would know whether they filed police reports on some machines without knowing who broke into them. He said that he received no restitution from the Defendant for the previous thefts and that the Defendant was not ordered to pay him.

On cross-examination, the victim testified that his company was based in Robertson County. He said that he had no direct knowledge of the damage done to individual machines but that his employees would know. He said the cost of hiring Major Currey and installing cameras in the machines was between $16,000 and $18,000. He said that he owned about 250 air machines and that they were not insured. He said he had not prosecuted anyone other than the Defendant for thefts from the machines.

On redirect examination, the victim testified that a number of his air machines had been located at Daily Stores and that his company lost that contract. He said that he was not sure if the contract loss was directly related to the thefts but that the time frame indicated it was.

Scotty Yates testified that he worked for Judge Casey Moreland and helped with the Drug Court program. He said the Defendant participated in the program about three years earlier. He said that a participant typically stayed in the program from twelve to eighteen months and that the program was divided into three phases. He said that the first phase was intensive and lasted about six months and that the second and third phases each lasted three to four months. He said that during the intensive phase, participants were required to live in a halfway house or submit to electronic monitoring, attend treatment four days a week, and check in with Judge Moreland weekly. He said that during the intensive phase of the Defendant's program, he was screened for drugs every day. He said that when participants were in phase two of the program, they faced the same requirements except that they went to treatment twice a week and checked in with Judge Moreland every other week. He said that during the last phase, participants moved into their own housing without electronic monitoring and attended treatment once a week. He said participants were still randomly screened for drugs during the last phase.

On cross-examination, Mr. Yates testified that the Defendant graduated from the Drug Court program. He said that the Defendant was electronically monitored some of the time and lived at halfway houses at other times. He said the program did not have Global Positioning System (GPS) devices when the Defendant was in the program. He said that the Defendant was placed in the program after Judge Moreland sentenced him to thirty days' incarceration for prior thefts and that the Defendant asked to be placed in the program

instead. He said he thought that the Defendant was falsely accused of breaking into some machines.

Mr. Yates testified that after Drug Court program participants graduated, they entered a transitional program called Back to Basics. He said that he occasionally contacted people in the Back to Basics program but that it was difficult to keep track of all the graduates. He said he remembered the Defendant because it was unusual for someone to choose such an intensive program over thirty days in jail and because the Defendant seemed humble and sincere about rehabilitating himself. He said the Defendant did not use drugs, except for one relapse, and graduated from the program. He agreed the Defendant's arrest placed him among the program's recidivism statistics.

The Defendant's wife, Stephene Bullard, testified that her relationship with the Defendant began eighteen years earlier, that they separated for four years, and that they reconciled in 2006. She admitted that she had problems with drugs in the past but said that she had not used drugs since 2006. She said her worst problems with drugs took place during the four years that she and the Defendant were not together. She admitted that she had a lengthy criminal record but said that the last time she faced a criminal charge was with the Defendant in Judge Moreland's court in 2006. She said that after her release from jail in 2006, she went to a halfway house and then into an outpatient program. She said that she graduated from the outpatient program and that she moved into the home she and the Defendant shared.

Ms. Bullard testified that since 2006, the Defendant's only arrest was for driving on a suspended license. She said that the Defendant worked but that he was not always able to make a living due to conflicts on the job and one employer who wrote bad checks. She said she had been collecting disability payments since 2007 for post-traumatic stress disorder and bipolar disorder. She said she and the Defendant had three biological children together and six children between them. She said that the Defendant was a great father and that their sons played football with him and talked to him about issues they did not feel comfortable discussing with her. She said that the Defendant had been the authority figure in the house and that since the Defendant's arrest, their sons did not listen to her. She said the Defendant's absence was hard on her and the children. She said two of the children, aged fourteen and sixteen, were in the courtroom for the hearing.

Ms. Bullard testified that she and the Defendant rented their home for $600 a month from the Defendant's aunt and uncle. She said her disability payments of $674 a month were their sole source of income. She said that their other bills included water, sewer, and trash and that although the utilities were in the homeowners' names, she and the Defendant were responsible for paying them. She said she gave $300 a month to the Defendant's aunt and

uncle for the electric bill. She said that before the Defendant's arrest, he was working for his brother-in-law, Wayne Mitchell, and that they were able to buy a 1996 Plymouth Voyager. She said that she paid for the Voyager but that without the Defendant there to keep it in good repair, she had to sell it. She said that Mr. Mitchell owned a tire shop and a couple of houses and that the Defendant was going to work on the houses. She said that Mr. Mitchell gave her a letter stating he would hire the Defendant again but that Mr. Mitchell was unable to appear in court for the hearing because of a restraining order in another case.

On cross-examination, Ms. Bullard testified that she had helped the Defendant steal money from coin machines in the past by driving him from one location to another. She acknowledged that their drug use affected their children. She admitted that when the Defendant was arrested in 1999, two of the children, who were one and three years old at the time, were with him. She said she did not think the Defendant was under the influence of drugs when he drove with the children in the car. She said that one of her sons was facing a charge in juvenile court and that she caught him under the influence of drugs. She said that she spoke to the children about not using drugs but that without the Defendant there, she had little authority. She said two of her children needed surgery.

Ms. Bullard testified that she collected disability payments because she had good and bad days with her disorders and that the Defendant supported her through the bad days when he was there. She said that she drank only once or twice a year but admitted that she was upset and drank after the Defendant's last court date. She said that she raised rabbits and that she earned an extra twenty or thirty dollars at a time selling them. She acknowledged that she spent $600 making phone calls to the Defendant since his arrest but said that Mr. Mitchell and others gave her the money for that purpose. She admitted the Defendant had access to a Jeep Cherokee, a white Plymouth van, and a white truck before his arrest, but she said she did not have access to all those vehicles. She admitted that the Defendant had an affair and that the other woman helped him get the vehicles.

Willis Dale Armstrong testified that he became friends with the Defendant when they were in Judge Moreland's Drug Court program. He said that he was a recovering drug addict and that he had not used drugs or alcohol for ten years. He said that he was not using drugs or alcohol when he entered the Drug Court program, that his ex-wife convinced Judge Moreland he needed treatment, and that he benefitted from the program. He said that he was in a halfway house for two years and that he managed the house after being there six months. He said Judge Moreland assigned the Defendant to the house with him. He said that the Defendant worked harder than anyone else in the house and that he and the Defendant worked together daily. He said that the Defendant relapsed a couple of times and that he helped the Defendant stop using drugs again.

Mr. Armstrong testified that he still occasionally attended meetings, talked to his sponsor, and stayed in touch with about forty friends who were in recovery. He said that he helped about one hundred people in recovery but that he had turned his attention to taking care of himself and his family. He said that he had sponsored the Defendant in the past and that he would be willing to sponsor him again and help him in any way he could. On cross-examination, Mr. Armstrong agreed that he had testified at court hearings for several individuals, including his son's hearing on a murder charge.

The Defendant testified that he became addicted to crack cocaine when he was twenty-seven years old, that he caused his wife to become addicted to cocaine, that he tried repeatedly to quit using cocaine, that he finished a couple of jail substance abuse programs, and that he was never able to stop using drugs. He agreed that he had a lengthy criminal history and said that it was all related to drugs. He said this arrest was the first time he had been clear-headed enough to look at his record and realize what he had done. He said that in the past, he accepted plea bargains on charges only because he was desperate to get out of jail and use drugs.

The Defendant testified that since his arrest on these charges, he had been incarcerated for seven months. He said that after his graduation from the Drug Court program, he relapsed when his business started to fail in January 2009. He said that he missed recovery meetings and that he was working eighteen-hour days in the neighborhoods where he knew people who used drugs.

The Defendant identified a photograph and testified that it showed an air machine located at Elm Hill Pike. He said he broke into the machine by loosening the bolts on the door with pliers. He said that once he opened the door, he could see that the drawer was locked. He said that he did not have a tool capable of cutting a lock and that he closed the machine and drove away.

The Defendant identified two photographs and testified that they showed an air machine located on Rivergate Parkway. He denied cutting a hole in the bottom right corner of the machine. He said that to get into the machine, he unscrewed the threaded lock housing, which caused a rod to fall out and allowed the door to open. He agreed that he returned to this machine more than once but denied opening any other machine more than once.

The Defendant identified a photograph and testified that it showed the location of an air machine from which he had stolen money but that the machine in the photograph was a replacement. He said the machine from which he stole had a hole in the bottom corner and

a missing lock housing. He said that he unscrewed the rod with pliers and that the door opened.

The Defendant identified a photograph of an air machine at Daily's on Charlotte Pike. He said that the machine in the photograph was a replacement and that it had been opened before. He said that he saw the employee's statement on the police report for that theft and that she said he backed into the parking lot, got out of his van, opened the machine, and then drove away when she came outside.

The Defendant identified a photograph and testified that it showed an air machine located on Lebanon Road and that the machine had duct tape on it. He said that the duct tape was on the machine when he arrived, and he denied cutting the hole in the machine. He said the metal rod was taped in place. He said he removed ten to fifteen dollars from the Lebanon Road machine. He said he typically removed between thirty and fifty dollars from each machine.

The Defendant identified a photograph and testified that it showed an air machine located on Robertson Road. He said he opened the machine by unscrewing the lock housing in order for the rod to fall out. He said that he learned to break into machines from other addicts and that when he was using drugs heavily, he drove some of those people around. He said that his usual method was to break into machines that others had already entered but that he had broken locks off some machines.

The Defendant testified that while incarcerated, he learned that he should have continued attending recovery meetings and should have asked for help when his financial problems grew worse. He said that after he graduated from Drug Court and before this arrest, he had been arrested twice for offenses related to his driver's license. He said that the first time, he forgot to pay a speeding ticket. He said that the second arrest happened when he fell asleep at the wheel and wrecked his truck while his children were riding in the back. He said he was arrested for driving without a license and having children in the back of a truck. He said the last charge was dropped because the children were over twelve years old. He said he paid his ticket and regained his driver's license. He said his license was suspended again for not paying child support. He said the hold on his license was released after he was able to show that he had paid child support.

The Defendant testified that if released on a restrictive program, he would continue his recovery and find friends like Mr. Armstrong. He said the Drug Court program worked for three years and then did not work. He said he "made a very bad decision."

On cross-examination, the Defendant denied that he told a friend over the telephone that he was going to call many people as witnesses in order to "smokescreen" the judge. The prosecutor played a tape of a telephone conversation. The Defendant said that on the tape, he was repeating something someone told him. The tape is not included in the appellate record.

When asked about drug relapses, the Defendant testified, "For ten years–there was no relapsing the ten years. I never quit." He said he had written things saying he was sorry to "the people" and sorry to his family. He admitted he opened two or three air machines that he was not caught opening. When asked about his responsibility for the crimes charged in his indictment, the Defendant said he was not responsible for the crime of felony vandalism because he did not destroy the machines.

The prosecutor read the Defendant's statement regarding the evading arrest charge from his presentence report:

> One morning I was leaving an Exxon and a police officer told
> me to stop. I did. But when he asked for my license, I knew
> that they had been suspended . . . and he was far away, so I
> drove off.

The Defendant admitted that his description omitted that he was at the location to tamper with a machine. He said that he was checking the machine to see if it was unlocked and that he often drove past locked machines to find ones that were unlocked.

The Defendant testified that he was seeking release on a community corrections program. He said he did not want his family to suffer any more for his mistakes. He admitted that when he relapsed, he had an affair. He said that he was sorry and that he never intended to hurt anyone. The Defendant explained that a previous aggravated assault conviction was part of a plea bargain to let his wife go home and that he had not hurt anyone and had only run away.

The trial court denied the Defendant's request for split confinement. The court stated:

> He does have . . . a previous history of criminal convictions.
> Those have been introduced. They are set out in the presentence
> report. The presentence report, as I count it, has twenty-two
> misdemeanor convictions, non-traffic related misdemeanor
> convictions, four felony convictions and five probation

violations in the past. The aggravated assault conviction is one of those felonies . . . which is, obviously, a violent offense.

. . .

So we get down to sentencing considerations. One of those is whether confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct. Nobody can argue that. That's a given. That would apply to Mr. Bullard.

Another is confinement being necessary to avoid depreciating the seriousness of the offense and whether it is particularly suited to provide an effective deterrence. That would apply, not necessarily to others. I don't know that there's anybody sitting out here in the Courtroom that now knows how to break into air machines would go do that if I don't impose a sentence. But it's more, in the Court's opinion, to deter Mr. Bullard, because in the past, according to these documents here in the presentence report, he's served weekends in jail, he's served sentences in jail and gotten work release, he's had intensive probation, he's been through misdemeanor Drug Court, he's gone to the Day [R]eporting Center, which is a group that tries to help people with job and addiction issues. And it just hasn't worked.

One of those other sentencing considerations is the potential or lack of potential for rehabilitation or treatment. So I give him Community Corrections and he makes it ninety days, six months. But his past indicates he'll be back. And I don't know how in the world I would fashion any kind of explanation to somebody else if, while on Community Corrections, he breaks into more machines. That would be my fault. And that's one of the legal issues that I have to be concerned with, protecting not only Mr. Hollingsworth, but other people that have been victimized by Mr. Bullard in the past and potentially in the future. He would say, and has said, I'll never do it again. Well, he's said that before. He has–one of those enhancing factors deals with previous history or unwillingness to comply with release conditions. That goes into the sentencing considerations

about potential for rehabilitation. I mean, he's had a lot of attempted help through various courts. It just hasn't worked.

So I do think confinement is necessary to protect society from Mr. Bullard, who has a really, really long history of criminal conduct and criminal convictions.

. . .

The other thing in terms of his family choices, Mr. Bullard's choices, is that–and I try to understand and deal with drug addiction issues and that's–Courts have already done that for Mr. Bullard in trying to get a handle on his drug addiction–but he's out taking his money. When he gets his money, illegally, he goes and buys drugs. He doesn't take it home to pay his bills.

The Defendant contends on appeal that the trial court erred by imposing sentences of continuous confinement because it should have placed him on probation following a period of confinement or sentenced him under the Community Corrections Act of 1985. See T.C.A. § 40-36-101 to -306 (2010). The State responds that the Defendant did not meet his burden of showing suitability for probation and a special need that would be better served in community corrections. We agree with the State.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d), -402(d) (2010). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

When determining if confinement is appropriate, the trial court should consider whether (1) confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct, (2) confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to people likely to commit similar offenses, or (3) measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1)(A)-(C) (2010). The trial court may also consider a defendant's potential or lack of potential for rehabilitation and the mitigating and enhancement factors set forth in Tennessee Code Annotated sections 40-35-113 (2010) and -114 (2010). T.C.A. §§ 40-35-103(5), -210(b)(5); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). The sentence imposed should be the least severe measure necessary to achieve the purpose for which the sentence is imposed. T.C.A. § 40-35-103(4).

The Defendant is eligible for probation because his sentences are under ten years and because his offenses are not among those excluded from consideration for probation. See T.C.A. § 40-35-303(a) (Supp. 2009) (amended 2010). However, because he was sentenced as a multiple offender for the felony evading arrest conviction, the Defendant is not considered a favorable candidate for alternative sentencing. See T.C.A. § 40-35-102(6) (stating that an eligible defendant who is "an especially mitigated or standard offender convicted of a Class C, D or E felony should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary"); see also State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008).

The Defendant concedes that the trial court correctly found a history of criminal conduct, but he argues that the other criteria for incarceration do not support continuous confinement because the State presented no evidence of the need for deterrence and because he had not failed any rehabilitative measures. The State argues that the trial court did not rely on the need for deterrence in denying probation and that the Defendant's multiple probation violations showed that measures less restrictive than confinement had been applied unsuccessfully. We agree with the State.

At the sentencing hearing, the trial court found that confinement was necessary to deter the Defendant from continuing to break into and steal money from air machines. The court explicitly stated that it was not ruling on the necessity of confinement to deter others from committing similar crimes. When other criteria support a denial of alternative sentencing, the trial court need not address the need for deterrence. See State v. Trotter, 201 S.W.3d 651, 656 (Tenn. 2006). In considering the need to keep the Defendant from offending again, the trial court referred to the Defendant's twenty-two non-traffic misdemeanor violations, four felony convictions, and five probation violations to find that the Defendant's criminal history indicated that if he were released, he would break into vending machines and victimize their owners again. The Defendant cites his graduation from the Drug Court program in February 2008 as proof that a measure less restrictive than confinement was recently applied to him successfully. The trial court noted the Defendant's participation in the Drug Court program and in other rehabilitative programs, but the court found that none of these measures had kept the Defendant from offending again. We conclude that the trial court properly considered the Defendant's criminal history and

performance under measures less restrictive than confinement. See T.C.A. § 40-35-103(1)(A)-(C).

The Defendant argues that because of the relationship between his drug abuse and criminal activity, the trial court should have found the special needs category of the Community Corrections Act applicable to his sentence. The State argues that the Defendant did not carry his burden of showing a special need that would be better served in the community. We agree with the State.

Under the Tennessee Community Corrections Act, trial courts may sentence certain non-violent felony offenders to community-based alternatives to incarceration. See T.C.A. § 40-36-103(1); State v. Grigsby, 957 S.W.2d 541, 547 (Tenn. Crim. App. 1997) (stating that "trial courts are in the best position to ascertain an offender's amenability to a community corrections program"). The Defendant does not argue that he is eligible under the criteria set out in subsection (a) of the Community Corrections Act. See T.C.A. § 40-36-106(a). We note that the trial court found that the Defendant's prior aggravated assault conviction was for a violent offense and that a criterion for eligibility under subsection (a) is that the Defendant's crimes not involve violence. See id. The Defendant argues instead that he is eligible under subsection (c), which provides that defendants "who would be usually considered unfit for probation due to histories of chronic alcohol or drug abuse or mental health problems, but whose special needs are treatable and could be served best in the community" may be eligible for community corrections. See id. at -106(c).

For a defendant to be found eligible for the special needs provision of community corrections, the trial court must determine that (1) the defendant is eligible for probation, (2) the defendant has a history of substance abuse or mental health problems, (3) these factors reasonably related to and contributed to the criminal conduct, (4) the special need is treatable, and (5) the treatment could be best served in the community. See Grigsby, 957 S.W.2d at 546-47 (citing Boston, 938 S.W.2d at 439). The defendant carries the burden of showing eligibility for the special needs provision. See Grigsby, 957 S.W.2d at 547 n.11. The Defendant relies on State v. Robin A. Conner, in which this court held that the defendant met the Grigsby criteria and "was a proper candidate for community corrections pursuant to the special needs provision." No. E2002-01075-CCA-R3-CD, Blount County, slip op. at 5 (Tenn. Crim. App. May 21, 2003). The defendant in Robin A. Conner was convicted of robbery and had a prior history of two misdemeanors committed fourteen years before the robbery. Id. The defendant presented medical evidence that she suffered from schizophrenia, depression, and psychosis, and she presented evidence that she had stopped taking her medication for these disorders at the time of the robbery. Id.

In contrast, in the present case, the Defendant's criminal history includes multiple convictions for vandalism and theft spanning sixteen years from 1993 to 2009, and by his own admission, he has repeatedly relapsed after court-ordered drug treatment. The Defendant has shown that he has a history of substance abuse that is related to and has contributed to his criminal conduct, but he has not carried his burden of showing that his special needs would be best served in the community. See Grigsby, 957 S.W.2d at 546-47. We conclude that the trial court did not abuse its discretion by denying alternative sentencing.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE